**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| -vs- | § § § | **SA-24-CR-0005-XR** |
| HECTOR DELGADO-ESCAMILLA, *Defendant* | § § § § | |

## ORDER

On this day came to be considered Defendant's motion to suppress (ECF No. 89). A hearing was held on this motion on July 30, 2024, and supplemental briefing was received on September 19, 2024 (ECF No. 121) and September 23, 2024 (ECF No. 122).

## Background

Defendant is charged with conspiring with others to purchase a Browning M249 on behalf of someone else in violation of 18 U.S.C. §§ 932(b)(2) and (c)(2). He is also charged with knowingly making a false statement to deceive the licensed firearms dealer regarding the actual buyer of the firearm in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2).

On December 4, 2023, Special Agent Jason Glance[1] received a tip of a suspicious purchase from an employee at Adelbridge Firearms & Co., a company that possesses a Federal Firearms License ("FFL"). This employee has previously provided tips to the ATF that have been reliable in investigating criminal activity. The FFL employee told SA Glance that someone from the Dallas area had called and was interested in purchasing an M249S, a 5.56 caliber semi-automatic version

---

[1] Jason Glance is a Special Agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").

of the M249 Squad Automatic Weapon light machine gun.[2]  The tip also stated that the person

from Dallas identified himself as Hector Delgado and that Delgado also said he "was trying to get

a family member to put money down on it for him" and that Delgado would be at the firearms

store at 10:00 a.m. on December 5.[3]

On December 5, Delgado arrived at the store about 10:09 a.m. and the FFL employee

notified agents that he was there.[4]  ATF agents were present at the store parking lot, but the FFL

employee texted a Special Agent that Delgado only had $5,000 cash and the weapon was being

sold for almost $10,000.  Delgado asked that the weapon be placed on layaway and that he would

be back later with the remaining funds.[5]

SA Eric Schlueter testified at the suppression hearing that agents saw Delgado Park[6] in the

FFL parking lot and that Delgado and another person later identified as Antonio Cortez-Chaves

enter the store and exit without any weapon.[7]  Delgado and Cortez got into Delgado's vehicle and

drove a few miles away to an apartment complex, where it was later discovered that Jorge Salvatori

Escobar-Barragan (Escobar) lived.  Special Agents followed Delgado to the apartment complex

but left after some time had elapsed.[8]

---

[2] SA Eric Schlueter testified that this weapon was "highly sought after by Mexican drug cartels."  ECF No. 112, July 30, 2024 Hearing Transcript at 7:10 ("Hearing Tr.").

[3] ECF No. 109-5, Def. Ex. 7.  Defendant's argument (ECF No. 122 at 4) that the information provided by the FFL "lacked considerable details" and "did not provide a sufficient basis" to justify the investigatory stop lacks merit and is overruled.  Defendant relies upon *United States v. Martinez*, 486 F.3d 855 (5th Cir. 2007).  *Martinez*, however, has been distinguished by numerous other Fifth Circuit cases as of late.  See, e.g., *United States v. Wright*, 74 F.4th 722, 733 (5th Cir. 2023) (reliance upon tip) ("The Fourth Amendment is not an insuperable barrier to legitimate police work. When conducting a brief investigatory detention, an officer just needs "reasonable suspicion" that crime is afoot. That is a low threshold, requiring only "some minimal level of objective justification."); *see also United States v. Ortiz*, 781 F.3d 221, 227 (5th Cir. 2015) (reliance upon tip).

[4] ECF No. 109-5, Gov't Ex. 7.

[5] *Id*.

[6] Delgado was seen driving a 2005 GMC Yukon. *See* ECF No. 109-1, Def. Ex. 1.

[7] Hearing Tr. at 12:2-11.

[8] *Id.* at 12:17-18.

At about 12:59, the FFL employee texted agents that Delgado had returned.[9]   Special Agents were parked at the store parking lot and at an adjoining business.   Once Delgado had completed the purchase of the firearm, he and Cortez were approached by Special Agents.[10]   Agent Courtney Rauch, along with Agents James Gibson and Schlueter spoke with Delgado.   Cortez was interviewed separately by other agents.   The Delgado interview was audio recorded.[11]   The agents introduce themselves and begin to ask (about two minutes into the audio recording) what type of weapon Delgado had just purchased.[12]   Delgado equivocates and merely states he saw the weapon on YouTube and could not provide other details about the weapon.   Indeed, he needed to show the agents the receipt to show what he had just purchased.[13]   During this interview Delgado was not arrested or handcuffed.[14]   Agents were in civilian clothes, no special agent had any weapons drawn, and no coercive tactics were applied.[15]   At all times Delgado was extremely cooperative[16] and never requested that the interview be stopped.   He possessed the keys to his vehicle.[17]

Nine minutes into the interview, which took place outside in the FFL parking lot, Delgado was informed that he would not be able to leave with the weapon, and he would be given a receipt for the weapon.[18]   A minute or so later agents inform Delgado that he could help himself and was

---

[9] ECF No. 109-5, Def. Ex. 7.
[10] Hearing Tr. at 14:1-3.
[11] *Id.* at 17:5-6; *see also* ECF No. 89-3, Dec. 5, 2023 Transcription of the First Audiotaped Interview of Hector Delgado-Escamilla ("First Interview Tr."); ECF No. 108-1, Gov't Ex. 1.
[12] Hearing Tr. at 20:1-9.
[13] *Id.* at 20:17-19.
[14] *Id.* at 18:21-23.
[15] *Id.* at 16:19-17:3.
[16] *Id.* at 22:11-15.
[17] *Id.* at 19:14-15.
[18] *Id.* at 22:20-23:10.

warned that it was a criminal offense to lie to federal law enforcement officers.[19]  About 13 minutes

into the interview, Delgado states that some "dude" gave him the money to buy the weapon.[20]

A few minutes after this statement, the agents asked Delgado whether he would go to their

office.[21]  He asked whether he would be arrested, and the agents told him they were not sure.[22]

Delgado offers to drive his vehicle to the office, but was denied and he ultimately he travels in one

of the agent's cars in the front seat.[23]  Again, at no time was he handcuffed.[24]

Once they arrived at the agents' office, Delgado is taken to a conference room, which was

unlocked.[25]  Again, he is not arrested, nor is he handcuffed.[26]  Delgado is given food and drink and

is allowed to leave the room to use the bathroom.[27]

The agents contemplate making a controlled delivery of the weapon to Escobar, the "true"

purchaser.[28]  During this interview Escobar has been repeatedly texting Delgado asking about what

is going on.[29]  Ultimately, the agents tell Delgado that it was ok to text Escobar back.[30]

About 4:00 p.m., Delgado is read his *Miranda* rights and asked to sign a written statement

of rights, and he does so.[31]  Then, the agent asks Delgado to repeat his earlier remarks and "start

from the beginning."[32]  During that time Delgado stated that Escobar provided the cash, that

---

[19] *Id.* at 23:15-24.
[20] *Id.* at 24:11-16.
[21] *Id.* at 25:24-26:1.
[22] *Id.* at 26:10-13.
[23] *Id.* at 26:15-17, 27:22-23, 68:14-16.
[24] *Id.* at 29:14-15.
[25] *Id.* at 33:17, 35:3-5.
[26] *Id.* at 34:5-6.
[27] *Id.* at 35:5-6.
[28] *Id.* at 29:25-30:2.
[29] *Id.* at 36:15-20.
[30] *Id.* at 36:21-23.
[31] ECF No. 108-3, Gov't Ex. 3.
[32] Hearing Tr. at 80:14-15.

Escobar called someone in Mexico to wire the extra monies needed to buy the weapon, and that he and Cortez had spent the night at Escobar's apartment.[33]

Meanwhile, agents contacted Escobar with Delgado's cell phone and made a controlled delivery of the weapon using Delgado's car.  At Escobar's apartment complex, Escobar was arrested.

**Defendant's Motion to Dismiss**

**I.    Defendant's argument there was no justification for the agents to question him when he exited the store with the M249 fails.**

"Warrantless searches and seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'  The Supreme Court carved out one such exception in *Terry v. Ohio*.  Under *Terry*, if a law enforcement officer can point to specific, articulable facts that lead him to reasonably suspect 'that criminal activity may be afoot,' he may briefly detain an individual to investigate."  *United States v. Darrell*, 945 F.3d 929, 932 (5th Cir. 2019) (internal citation omitted).   "The precise contours of the reasonable-suspicion standard remain 'somewhat abstract.'  Certainly, reasonable suspicion is a less demanding standard than probable cause or preponderance of the evidence, but the Supreme Court has deliberately avoided reducing it to 'a neat set of legal rules.'  Instead, it has described reasonable suspicion simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity.  In short, while reasonable suspicion is not a 'finely-tuned standard[ ],' it is well established that 'the Fourth Amendment requires at least a minimal level of objective

---

[33] *See generally* ECF No. 89-6, Audio Transcription of the Second Interview of Hector-Delgado-Escamilla ("Second Interview Tr.").

justification for making' an investigatory stop." *Darrell*, 945 F. 3d at 932-33 (internal citations omitted).

In this case, the Government has established that the agents had "specific and articulable facts that support the reasonableness of the suspicion." ATF Agent Schlueter articulated "more than an inchoate and unparticularized suspicion or hunch of criminal activity." Schlueter testified that he received a tip from a reliable source. That tip stated that a person was traveling from Dallas to San Antonio to buy a weapon known to be in demand from Mexican drug cartels. The tip also suggested that Delgado did not have all the money needed to buy the weapon and "was trying to get a family member to put money down on it for him." When agents were at the FFL parking lot, they noticed Delgado driving a used vehicle that was inconsistent with having the means to buy a $10,000 firearm. Delgado's first visit to the store confirmed he did not have all the funds needed to make the purchase. There was therefore ample justification for the investigatory stop when Delgado later exited the store with the weapon.

Further, there was justification for the continued questioning when Delgado tells agents that he lives in Dallas with his mother and brother living with him in a one-bedroom apartment, and that he had used fast cash loan companies in the past, again providing uncertainty where the money came from to buy this weapon. Delgado arrived at the San Antonio store saying he was from Dallas with insufficient funds, causing agents to wonder where he would secure the remaining $5,000. Defendant also referred to a friend in Dallas who sells weapons, again questioning who the true purchaser was. Despite the $10,000 price tag, Delgado did not know the model of the weapon he had just purchased. The questioning was not done in a coercive manner,

the tone by all (including Delgado) was normal.[34]   The motion to suppress any statements made before this time is denied.

Defendant argues that individual acts he was engaged in could not be considered as bases for showing "reasonable suspicion."   For example, he argues that driving from Dallas to San Antonio to buy a weapon is not illegal and "borrowing" money or being "gifted" funds to buy a weapon is not illegal.   That, however, is not the standard that applies to determining whether justification existed to question Defendant.   See *United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020) ("an officer can have a reasonable suspicion without ruling out every innocent explanation.   We account for the totality of the circumstances in determining whether there was a 'particularized and objective basis' for suspecting legal wrongdoing." (internal citations omitted)).

## II.   Were agents required to administer *Miranda* warnings when they launched into misleading statements and sought information related to the straw purchase?

At about 9 minutes and 20 seconds into the initial interview, agents inform Delgado that he was lying, that "intel people" had been "running [him] up the last week or so" and that "they have already got[ ] into [his] phone."[35]   They also told him that "this [was] not something that's going to go away," he would not be allowed to leave with the weapon, today would probably be the last opportunity for him to tell agents who was buying the weapon and where the money came from, and they know "100%" that his money was not used to buy the weapon.[36]   The agents warn him he could be charged with a criminal offense of lying to federal law enforcement officers and

---

[34] Hearing Tr. at 22:5-6 (Delgado stated "that's fine" and "okay" multiple times during the interview).
[35] First Interview Tr. at 23:21-23.
[36] *Id.* at 24:12-25, 25:25-27:1.

that he had a "lot to lose."[37]  About thirteen minutes into the interview Delgado admits that "some dude" gave him the money to make the purchase.[38]

A person must be given *Miranda* warnings when they experience a custodial interrogation, which occurs when questioning is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of their freedom of action in a significant way.  For *Miranda* purposes, an individual is considered "in custody" when they are placed under formal arrest or when a reasonable person in the suspect's position would understand the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.  "Restraint on freedom of movement usually resembles formal arrest when, 'in light of the objective circumstances of the interrogation, ... a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'"  *United States v. Coulter*, 41 F.4th 451, 457 (5th Cir. 2022).

In *Coulter*, the defendant a traffic stop was conducted, and Coulter admitted to not having identification.  A background check was conducted, and it revealed Coulter's license had been suspended.  Coulter then admitted he was on parole for aggravated robbery.  After the police officer smelled marijuana coming from the car Coulter told the officer he "want[ed] to be real with [him]" and volunteered that he had a gun in the van.  For officer safety Coulter was put in handcuffs.  Officer Guzman then "asked him where the suspected gun was. Coulter then explicitly admitted for the first time that he had a gun in his backpack. Coulter later suggested that Officer Guzman could just take the gun and let him go. While Coulter remained handcuffed and standing in the street, a fellow officer arrived, searched the van, and located the gun along with .37 ounces

---

[37] *Id.* at 26:14-16, 28:9.
[38] *Id.* at 29:15.

(approximately 10 grams) of marijuana in his backpack.  Officer Guzman then arrested Coulter."
*Coulter*, 41 F.4th at 455.

After his indictment, Coulter moved to "suppress all statements [he made] in response to
the officer's questioning once he was in handcuffs.  Coulter contended for the first time that he was
in custody once handcuffed and that Officer Guzman did not deliver the requisite *Miranda*
warnings. The government responded that Coulter was not in custody just because he was
handcuffed, and *Miranda* warnings were therefore unnecessary."  *Id*.

In reversing the trial court's order granting his motion to suppress, the Fifth Circuit
reiterated that the trial court should assess the "totality of the circumstances" and consider the
following factors:

• First, the length of the questioning;

• Second, the location of the questioning;

• Third, the accusatory, or non-accusatory, nature of the questioning;

• Fourth, the amount of restraint on the individual's physical movement; and

• Fifth, statements made by officers regarding the individual's freedom to move or leave.

*Id*. at 458.

At this point Delgado had only been interviewed for about thirteen minutes, and the
questioning was done in public and not in any law enforcement facility.  There was no restraint on
his physical movement, he was not handcuffed and possessed his car keys.  He could have left,
though without the weapon and a receipt would have been given to him.  All these factors suggest
he was not in custody.  No evidence supports Defendant's argument that "over five agents

block[ed] and prevent[ed] Mr. Delgado from getting to his vehicle or leaving the FFL parking lot."[39]  Yet the questions were accusatory, and the agents never directly told him he was free to leave at any time.  These factors suggest that he was in custody.  Based on the totality of the circumstances, however, viewed in the light most favorable to Delgado, a reasonable person in his position would not have equated the situation with formal arrest.  *Coulter*, 41 F.4th at 462.

Even if the Court is incorrect in this determination, the Fifth Circuit instructs trial courts to "determine whether the relevant environment in which [Delgado] was questioned present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Id*. at 462.  Despite Defendant's arguments about the number of agents at the scene, only two to three unarmed agents ever questioned Delgado.  No weapons were drawn, and it is virtually uncontested that the tone of the questions and the banter between Delgado and the agents was cordial.  The Court, however, expresses concern over the deceptive nature of the questions posed to Delgado.   The agents only received the tip the day before they questioned Delgado.  The agents misrepresented that "intel people" had been "running him up the last week or so"[40] and that "they have may already got into his phone."  They also misrepresented the extent that they knew "100%" that his money was not used to buy the weapon.[41]   Despite these misrepresentations, the environment in which agents questioned Delgado at the FFL parking lot "did not present the same inherently coercive pressures as the station house questioning at issue in *Miranda*."  *Id*.  See also *United States v. Laurita*, 821 F.3d 1020, 1026 (8th Cir. 2016) ("The use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart."); *United States v.*

---

[39] ECF No. 89 at 23.

[40] SA Schlueter did testify that prior to the investigatory stop agents did link Delgado to the number calling the arms dealer and they confirmed Delgado was living in the Dallas area.  *See* Hearing Tr. at 8:3-11.

[41] Despite Defendant's argument to the contrary, the agents warning Delgado that could be charged with a criminal offense of lying to federal law enforcement officers and that he had a "lot to lose" was not coercive, but accurate.

*Panak*, 552 F.3d 462, 471 (6th Cir. 2009) ("The question in the end is not whether the individual felt pressure to speak to the officers but whether she was forced to stay with them. No such showing was made here."). The motion to suppress any statements made by Delgado up to this time is denied.

### III.   Should any statements made by Delgado en route to the ATF office or while in the ATF conference room be suppressed?

About 17 minutes into the questioning, the agents state that they need to leave the parking lot to figure out the next steps in delivering the weapon to the actual buyer. Delgado asks whether he will be arrested, and the agent responds that he "can't tell [him] either way."[42] The agent encourages Delgado with a statement that "working with us isn't a bad idea."[43] Delgado agrees to go to the agents' office. He initially requested to drive his own vehicle there, but that request was denied. Delgado also requested to call his mother on his cell phone, but that request is denied. It appears that Delgado enters the vehicle driven by agents about 22 minutes into the interview. The questions and answers remain civil and cooperative, even jovial in many instances. Delgado initiates many of the conversations. Questions about the source of funds and contact with Chuy are asked. Delgado volunteers answers. About 36 minutes into the interview, Delgado and the agents arrive at the agents' offices. At 2:26 p.m., they enter a conference room and Delgado is asked to put his cell phone on the table.[44]

Applying the totality of the circumstances test and the factors referenced in *Coulter*, the length of the questioning (36 minutes or so in total) is not excessive. The location is in a vehicle for the most part, and there is no evidence that the Delgado was prohibited from asking the agents

---

[42] First Interview Tr. at 38:10.
[43] *Id.* at 38:20-21.
[44] ECF No. 108-1, Gov't Ex. 1; *see also* Hearing Tr. at 101:6-7.

to stop the vehicle and let him out.  He was never handcuffed or otherwise restrained.  The questions were again directed to who the buyer of the weapon was, and by implication that a straw purchase had been conducted by Delgado.  Delgado was never given any *Miranda* warnings or advised that he was free to leave.  After a review of the audiotape, the "totality of the circumstances" test compels the conclusion that no force or coercive tactics were used by the agents.  At times Delgado volunteered information without being asked any question and at times Delgado and the agents were laughing and engaging in "small talk."   The motion to suppress any statements made by Delgado up to this time is denied.

**IV.     Should any statements made by Delgado after 2:26 p.m.be suppressed?**

At about 4:00 p.m. another taped interview is conducted by agents at the ATF office for "formal reasons."[45]  At the start of this interview, Delgado is given his *Miranda* warnings.  He is asked to sign a waiver of rights and consent to search his cell phone.  At this point Delgado asks whether he was supposed to sign the form before they took his phone.  The agent responds that they took his phone as evidence but implies that the phone was not searched, and that Delgado can merely sign the form, or they could get a warrant to search the phone.  The agent adds that "you [already] showed us all the stuff on [your] phone."[46]   The agent then asks Delgado to start recounting the facts of this case, and the interview concludes about 4:53 p.m.

It is uncertain what took place between 2:26 and 4:00 p.m.  No audio recordings were apparently done during this time.  SA Schlueter testified that no recording was done during this time because the agents were still trying to figure out the logistics of how to make a controlled

---

[45] Second Interview Tr. at 2:19.
[46] *Id.* at 4:9-10.

delivery of the weapon to Escobar.[47]  Defendant argues that "it is apparent that agents, without obtaining consent, took possession of, used, and searched Mr. Delgado's phone and vehicle."[48] Delgado states that from 1:54 p.m. till 2:42 p.m., Escobar was sending text messages to his cell phone inquiring about the status of the gun purchase.  At 2:44 p.m., a reply text message is sent to Escobar stating:  "We're finishing up the paperwork."[49]  Other reply text messages were sent from Delgado's cell phone at 2:49 p.m., 3:02 p.m., 3:52 p.m., 3:58 p.m., 4:01 p.m., and 4:02 p.m.[50]  The agents state that Delgado "provided consent for Agents to use his phone to continue communication with ESCOBAR and consent to use his vehicle to facilitate the controlled delivery."[51]    It appears from some questions asked during the second taped interview that agents had seen the cell phone call history and perhaps the contacts.

Delgado argues that any statements he made should be suppressed because the agents used a two-step, "question first" strategy forbidden under *Missouri v. Seibert*, 542 U.S. 600 (2004) (Seibert was first interrogated without *Miranda* warnings and subsequently given a break, after the break, *Miranda* warnings were administered, and the questioning resumed, leading Seibert to repeat her prior confession.).  The Fifth Circuit has construed *Seibert* to require that the trial court first determine whether the agents employed the proscribed two-step strategy.  Secondly, if the trial court concludes that the impermissible strategy was used, the court should determine whether the pre- and post-warning statements were voluntarily given.  See *United States v. Fernandez*, 48 F.4th 405, 411 (5th Cir. 2022) (permitting "a post-warning confession even where the police had

---

[47] Hearing Tr. at 35:16-25.
[48] ECF No. 89 at 8.
[49] ECF No. 89-5 at 8. SA Schlueter testified that Delgado initially responded to the texts voluntarily at their direction to "buy a little time."  Hearing Tr. at 37:6-7.
[50] ECF No. 89-5 at 11-12, 15-16, 19-20, 22. SA Schlueter testified that most of these remaining reply texts were done by agents after Delgado voluntarily allowed them to use his phone and car.  *See* Hearing Tr. at 37:8-10.
[51] ECF No. 89-7 at 2.

previously obtained a pre-warning confession, so long as the pre-warning confession was voluntary, and the second statement was also voluntarily made.").

As stated above the pre-*Miranda* warning confession was made voluntarily. The credible evidence elicited at the suppression hearing also concludes that the pre-*Miranda* warning statements made verbally, but not recorded, were made voluntarily.[52] The Court finds that Delgado's testimony that agents took and used his phone without permission not credible. Given the amount of information that he voluntarily disclosed at the parking lot, during the car ride, and at the ATF office, it is not credible that he was now refusing consent from 2:26-4:00 p.m. It is also notable that Delgado did not voice any protestations when the recording recommenced at 4:00 p.m. Merely asking whether he should have signed the written consent earlier is hardly a protestation, but more of wondering whether a clerical mistake was made.

The Court concludes that even if an impermissible *Seibert* tactic was employed, pursuant to the Fifth Circuit's directive in *Fernandez*, no suppression is warranted due to the voluntariness of the statements made. The court also finds that Delgado provided verbal consent for his phone and vehicle to be used to affect the controlled delivery of the weapon to Escobar, and the motion to suppress evidence from the cell phone and use of the vehicle is denied.

## Conclusion

Defendant's motion to suppress (ECF No. 89) is **DENIED**.

It is so **ORDERED**.

---

[52] *See* Hearing Tr. at 72:22-23, 76 (SA Schlueter discussing Delgado's cooperation, stating that "[Delgado] was so cooperative," "fine with it," and "his level of cooperation, I think part of this was like his idea"); *see also id.* at 101:24-102:2 (Agent Courtney Rauch discussing Delgado's cooperation).

**SIGNED** this 25th day of September, 2024.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE